[Cite as *State v. King*, 2012-Ohio-1281.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### WYANDOT COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  16-11-07

      v.

KIMBERLY KING,                    O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Wyandot County Common Pleas Court
Trial Court No. 10-CR-0028

**Judgment Affirmed**

**Date of Decision:  March 26, 2012**

APPEARANCES:

    *Nicholas Siniff* **for Appellant**

    *Jonathan K. Miller* **for Appellee**

**SHAW, P.J.**

{¶1} Defendant-appellant, Kimberly S. King ("King"), appeals the July 15, 2011 judgment of the Wyandot County Court of Common Pleas journalizing her conviction by a jury for one count of felony operating a vehicle while under the influence of alcohol and/or drug of abuse, in violation of R.C. 4511.19(A)(1)(a), (also referred to as the offense of "OVI"), and sentencing her to serve an aggregate prison term of twenty-six months, with sixty days of that sentence being a mandatory prison term. As part of the verdict, the jury also found that King, within twenty years of the current offense, had been previously convicted of or pleaded guilty to five or more violations of operating a vehicle while under the influence of alcohol and/or drug of abuse, or other equivalent offenses, which enhanced her conviction from a misdemeanor to a felony of the fourth degree.

{¶2} On May 19, 2010, sometime after midnight, the Wyandot County Sheriff's Office received a phone call from a witness named, Kelly Wickham, to report that a single car accident had occurred on County Road 96. Wickham recalled that when he first arrived at the scene, the vehicle was flipped-over on its hood with the headlights still illuminated. Wickham approached the vehicle to see if anyone was inside and saw one person moving around between the driver's and passenger's seats. Shortly, thereafter, the occupant of the vehicle emerged from the passenger's side of the vehicle.

{¶3} Approximately ten minutes later, Officer Nathan Fawcett of the Carey Police Department arrived on the scene. Officer Fawcett spoke to the occupant of the vehicle and was able to confirm her identity as the appellant, King. During his initial conversation with King, Officer Fawcett recalled King informing him that she was the only occupant of the vehicle. Officer Fawcett determined that King was under the influence of alcohol based on his observations and interactions with her. Officer Fawcett also discovered a crushed beer can near the vehicle during his investigation of the accident. Neither Wickham nor Officer Fawcett observed anyone besides King at the scene.

{¶4} Other first responders from the local fire department arrived on the scene while Officer Fawcett continued to investigate the accident. At this time, King informed one of the first responders that someone else was in the vehicle. Based on her inconsistent statements, Officer Fawcett again questioned King about the number of occupants in the vehicle. King subsequently fainted and momentarily lost consciousness without responding to Officer Fawcett. At this time, Deputy McKinnon, the law enforcement officer in charge of the investigation, arrived on the scene. Officer Fawcett relayed his observations indicating that King was under the influence and informed Deputy McKinnon of King's inconsistent statements regarding the number of occupants in the vehicle. Deputy McKinnon did not have an opportunity to speak to King at the accident

scene because King was being administered medical treatment and Deputy McKinnon did not want to interfere.

{¶5} After fainting, King was transported to a local hospital. While at the hospital, King was secured to a backboard and her neck was placed in a "c-collar."

{¶6} Deputy McKinnon arrived at the hospital shortly after King. Upon seeing King, he observed her behaving in a belligerent manner toward the hospital staff, yelling that she wanted to go home and refusing treatment. After King had been stabilized, Deputy McKinnon approached King and informed her that he was investigating the accident. Deputy McKinnon recalled that at first King was belligerent and rude to him and refused to cooperate with his investigation. However, King then initiated conversation, asking Deputy McKinnon what had happened with the accident. King then admitted that she had been drinking earlier that night and informed Deputy McKinnon that she had met a man at a bar. King claimed this man was driving the vehicle before the accident. However, King refused to provide any further information to Deputy McKinnon about this man or the events preceding the accident. While speaking to King, Deputy McKinnon noticed a strong odor of alcoholic beverages emitting from King.

{¶7} Deputy McKinnon subsequently read King the BMV 2255 form and advised her that she was under arrest for operating a vehicle while under the

influence of alcohol.[1]  Deputy McKinnon testified that the only question he asked

King after placing her "under arrest" was to request she submit to a test to measure

the level of alcohol in her system.  King consented and the hospital staff then

entered the room to draw King's blood.  The hospital staff subsequently asked

Deputy McKinnon if King was free to leave the hospital.  Deputy McKinnon

responded that because of the nature of her injuries he was not going to take King

into custody, meaning that he was not going to transport her to the Sheriff's Office

to be incarcerated.  While at the hospital, Deputy McKinnon also spoke to King's

husband and informed him that he was not going to take King into custody and

that she would be released from the hospital.  Deputy McKinnon informed King's

husband that King needed to contact him later that day so he could speak to her

about the accident.  Hours later, King was released from the hospital and was sent

home that morning.

{¶8} Later the same day, King left a message for Deputy McKinnon

informing him she would be at home.  Deputy McKinnon drove to King's home

and spoke with her there.  King invited Deputy McKinnon inside her home and

---

[1] Deputy McKinnon's reading of the BMV 2255 form served to inform King that she was "under arrest" for OVI, in addition to informing her of the consequences of refusal to submit upon request to a chemical test and the consequences of submission to the chemical test if found to have a prohibited concentration of alcohol in the blood, breath or urine.  Even though Deputy McKinnon characterized his actions as placing King "under arrest" the record indicates that he had no intentions of handcuffing King and taking her to the Sheriff's Office as in a formal custodial arrest.  Rather, the testimony at the suppression hearing and at trial indicates that Deputy McKinnon informed both the hospital staff and King's husband that King was free to leave the hospital upon medical discharge.  It appears from the record that rather than executing a custodial arrest, Deputy McKinnon simply intended to issue King a citation for OVI as a result of his interview with her at the hospital.

they had a conversation at the kitchen table. This conversation between Deputy McKinnon and King was recorded. Prior to the interview, Deputy McKinnon informed King that she was not under arrest and was free to stop the conversation at any time. This time King was more forthcoming and willing to cooperate with Deputy McKinnon's investigation of the accident. King again admitted to drinking the night before and was able to recall drinking at four different places. However, King claimed she could not remember the accident. And King stated that she did not *think* she was driving.[2]

{¶9} King could also not clearly remember if she was with a man before the accident. King was able to recall being in the passenger's seat after the accident. Deputy McKinnon also asked King about her previous convictions for OVI. King could recall some of the details of her prior OVI convictions, specifically whether or not she was represented by an attorney at the time. After their conversation, Deputy McKinnon left King's home and did not take her into custody.

{¶10} On June 9, 2010, King was indicted on the following two counts. Count One alleged that King "did operate a motor vehicle while under the influence of alcohol, a drug of abuse, or a combination of them, and within 20 years of this offense, said offender had previously been convicted of, or pleaded guilty to, five or more violations of [R.C.] 4511.19(A) or (B), Operating a Vehicle

---

[2] We note that on appeal King does not challenge the trial court's determination that she was not in custody when she made these statements at her home. Rather, King only raises the issue of custody with respect to the statements she made to Deputy McKinnon at the hospital.

While Under the Influence of Alcohol and/or Drug of Abuse, or other equivalent offenses," in violation of R.C. 4511.19(A)(1)(a), a felony of the fourth degree. (Indictment, Jun. 9, 2010). The indictment also listed five of King's previous convictions for OVI, which occurred in 1995, 1997, 2002, 2003 and 2008.

{¶11} Count Two alleged that King "did operate a motor vehicle while having a concentration of two-hundred four-thousandths of one percent or more by weight per unit volume of alcohol in the person's blood serum or plasma; and within 20 years of this offense, said offender has previously been convicted of, or pleaded guilty to, five or more violations of [R.C.] 4511.19(A) or (B), Operating a Vehicle While Under the Influence of Alcohol and/or Drug of Abuse, or other equivalent offenses," in violation of R.C. 4511.19(A)(1)(g), a felony of the fourth degree. (Indictment, Jun. 9, 2010).

{¶12} On June 16, 2010, King was arraigned and pled not guilty to the charges. On June 28, 2010, King filed a demand for discovery. The trial court released King on her own recognizance, but imposed a curfew on her from 6:00 p.m. to 6:00 a.m. "with the exception of AA meetings, gainful employment and [Intensive Outpatient Treatment] meetings through Firelands." (JE, June 21, 2010 at 2). On July 2, 2010, the prosecution complied with King's request for discovery and filed a reciprocal demand for discovery.

{¶13} On July 19, 2010, King filed a motion to dismiss/suppress, requesting the trial court to suppress Deputy McKinnon's observations and opinions regarding King's alcohol level, to suppress any statements made by King, and to suppress any tests of her alcohol level on the grounds that the tests were not performed in accordance with Ohio law. King also requested the trial court dismiss the case based on her challenge of the prosecution's use of her 1995 OVI conviction for enhancement purposes.

{¶14} The hearing on King's motion to dismiss/suppress was scheduled to be heard on August 3, 2010.

{¶15} On July 26, 2010, the prosecution filed a motion for continuance, requesting the trial court to continue the hearing on King's motion to dismiss/suppress on the grounds that one of its witnesses was unavailable for the hearing and that it needed more time to subpoena and prepare its four witnesses for the hearing.

{¶16} On August 4, 2010, the trial court granted the prosecution's motion for continuance and rescheduled the hearing on King's motion to dismiss/suppress for September 30, 2010.

{¶17} On August 31, 2010, King filed a motion for an order modifying her bond conditions, requesting the trial court to extend her curfew from 6:00 p.m. to

10 p.m. On September 10, 2010, the trial court denied King's motion for an order modifying her bond conditions.

{¶18} On September 30, 2010, the trial court held a hearing on King's motion to dismiss/suppress. At the hearing, the prosecution asked that Count Two of the indictment be dismissed due to a flawed procedure at the laboratory which contaminated King's blood sample. At this time, King elaborated on a specific ground to support her motion to suppress. King argued that she was in "custody" at the time she made her statements to Deputy McKinnon in the hospital and that Deputy McKinnon failed to advise her of her Miranda rights prior to her making any statements. Therefore, King asserted that her statements to Deputy McKinnon at the hospital must be suppressed because they were obtained in violation of her Fifth Amendment rights.

{¶19} King also argued that the prosecution should not be permitted to use her 1995 OVI conviction as an enhancement to raise the degree of her current offense from a misdemeanor to a felony. King argued that her 1995 OVI conviction was constitutionally infirm because it was the result of an uncounseled plea, which was obtained without a valid waiver of her right to counsel. Accordingly, King maintained that Count One of the indictment should be dismissed.

{¶20} On October 7, 2010, King filed a supplemental memorandum in support of her motion to dismiss/suppress.

{¶21} On January 13, 2011, the trial court issued a twelve-page opinion overruling King's motion to dismiss/suppress. Prior to outlining its reasons for overruling King's motion, the trial court dismissed Count Two of the indictment based on the grounds asserted by the prosecution that King's blood sample was contaminated at the laboratory. The trial court then addressed the remaining issues raised in King's motion.

{¶22} In a thorough analysis of the totality of the circumstances, the trial court determined King was not in custody at the accident scene, at the hospital or at her home when she made statements to Officer Fawcett and Deputy McKinnon. The trial court also determined that King failed to meet her burden of proof to demonstrate by a preponderance of the evidence that her 1995 OVI conviction was constitutionally infirm. Therefore, the trial court determined that King's 1995 OVI conviction could be used by the prosecution for enhancement purposes in the current offense.

{¶23} On February 3, 2011, 216 days after the request was filed, King filed her response to the prosecution's reciprocal discovery demand.

{¶24} On April 18, 2011, King filed a second motion for an order modifying her bond condition, requesting permission to modify her curfew. On

April 21, 2011, King filed a motion to strike the prosecution's response to her Notice regarding an alleged agreement between the parties as to which portions of the recorded interview between King and Deputy McKinnon would be played to the jury.

{¶25} On April 21, 2011, the trial court granted King's motion for an order modifying her bond condition. On April, 22, 2011, the trial court overruled King's motion to strike the prosecution's response to her Notice.

{¶26} On April 26, 2011, a two-day jury trial commenced. Prior to the empaneling of the jury, King filed a motion to dismiss pursuant to R.C. 2945.73(B), alleging that the prosecution failed to bring her case to trial within the required statutory timeframe and that her right to a speedy trial had been violated. The trial court overruled King's motion to dismiss on the record, noting that King failed to consider the delays occasioned by her own motions; in particular the days tolled to resolve the issues raised in her motion to suppress.[3]

{¶27} The case proceeded to trial. Several witnesses testified on behalf of the prosecution. King presented no evidence in her defense. On April 27, 2011, the jury returned its verdict, finding King guilty of felony operating a vehicle while under the influence of alcohol and/or drug of abuse, in violation of R.C. 4511.19(A)(1)(a). The jury also found that King, within twenty years of the

---

[3] The trial court journalized its decision on King's motion to dismiss on speedy trial grounds in its April 29, 2011 Judgment Entry.

current offense, had been previously convicted of or pleaded guilty to five or more violations of operating a vehicle while under the influence of alcohol and/or drug of abuse, or other equivalent offenses.

{¶28} On July 15, 2011, the trial court sentenced King to serve an aggregate prison term of twenty-six months, with sixty days of that sentence being a mandatory prison term.

{¶29} King subsequently appealed, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS BECAUSE APPELLANT'S 1995 OVI CONVICTION WAS ENTERED WITHOUT THE APPROPRIATE EXPLANATION AND WAIVER OF HER RIGHT TO COUNSEL THEREBY VIOLATING APPELLANT'S SIXTH AMENDMENT RIGHT TO COUNSEL AND A RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO STATE CONSTITUTION.**

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO A SPEEDY TRIAL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION, AND R.C. 2945.71 ET SEQ.**

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION TO SUPPRESS HER STATEMENTS MADE WHILE SHE WAS IN POLICE CUSTODY THEREBY VIOLATING HER RIGHTS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO.**

## ASSIGNMENT OF ERROR NO. IV

**APPELLANT'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION WAS VIOLATED WHEN TRIAL COUNSEL SUGGESTED THAT APPELLANT'S ENTIRE DRIVING RECORD, WHICH LISTED A LICENSE SUSPENSION FOR A FELONY DRUG OFFENSE BE ADMITTED INTO EVIDENCE.**

## ASSIGNMENT OF ERROR NO. V

**THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION BY ENTERING VERDICTS OF GUILTY, AS THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Second Assignment of Error*

**{¶30}** In her second assignment error, King asserts that the trial court erred when it overruled her motion to dismiss for a violation of her right to a speedy

trial. Because King raises a threshold matter, we elect to address this assignment of error first.

**{¶31}** The Sixth Amendment of the United States Constitution as applied to the States through the Fourteenth Amendment, as well as Article I, Section 10 of the Ohio Constitution dually afford a defendant the right to a speedy trial. In Ohio, the right to a speedy trial is also statutorily defined. R.C. 2945.71–2945.73. Specifically, R.C. 2945.71(C)(2) states that a person who is charged with a felony must be brought to trial within 270 days after he is arrested. The day of arrest does not count when computing a speedy trial violation. *See State v. Masters*, 172 Ohio App.3d 666, 2007–Ohio–4229, ¶ 12; Crim.R. 45(A).

**{¶32}** If a defendant who is charged with a felony is not brought to trial within the required time period, the charge against him must be dismissed and the prosecution is barred from pursuing "any further criminal proceedings against [the defendant] based on the same conduct." R.C. 2945.73(B), (D). Once a defendant makes a prima facie showing that he or she was not brought to trial within the proper period, the burden shifts to the State to demonstrate that sufficient time was tolled or extended under the statute. *Masters*, 172 Ohio App.3d 666, 2007–Ohio–4229, at ¶ 10, citing *State v. Butcher*, 27 Ohio St.3d 28, 31 (1986).

{¶33} The running of the speedy-trial clock may be temporarily stopped, or tolled, only for reasons listed in R.C. 2945.72. Revised Code 2945.72 states, in pertinent part, that

> [t]he time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
>
> * * *
>
> (D) Any period of delay occasioned by the neglect or improper act of the accused;
>
> (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
>
> * * *
>
> (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion * * *.

R.C. 2945.72(D), (E), (H). These tolling events "do not unconditionally extend the time limit in which an accused must be brought to trial, but, rather, this limit is 'merely extended by the time necessary in light of the reason for the delay.' " *State v. Arrizola*, 79 Ohio App.3d 72, 75, (3d Dist. 1992), quoting Committee Comment to H.B. 511. In reviewing "a speedy-trial issue, a court is required to count the days of delay chargeable to either side and determine whether the case was tried within applicable time limits." *State v. Sanchez*, 110 Ohio St.3d 274, 2006–Ohio–4478, ¶ 8.

{¶34} Here, King was arrested on May 19, 2010. Pursuant to R.C. 2945.71(C)(2), she had to be brought to trial by February 13, 2011, 270 days later. As previously noted, King was not brought to trial until April 26, 2011, 342 days after her arrest. Consequently, King has made a prima facie showing that her speedy trial rights were violated by 72 days. Thus, the next question is whether any tolling events occurred.

{¶35} Our review of the record reveals that several tolling events occurred, totaling in excess of 72 days. The largest amount of time tolled during the proceedings was the 178 days from the filing of King's motion to dismiss/suppress on July 19, 2010 to the trial court's ruling on the motion on January 13, 2011. *See* R.C. 2945.72(E). However, on appeal, King contends that the 178 days it took for the trial court to rule on her motion to dismiss/suppress was unreasonable and thus should not be charged against her.

{¶36} In making this argument, King directs this Court's attention to our prior decision in *State v. Arrizola*, 79 Ohio App.3d 72, 75 (3d Dist. 1992). In *Arrizola*, we determined that a court must review the complexity of the facts and the legal issues involved as well as the time constraints on the trial judge's schedule to assess the reasonableness of the extension of time for a trial court to rule on a defendant's motion to suppress. *Id*. at 76. In this case, the record does not indicate that the facts and legal issues raised by King in her motion to

dismiss/suppress were particularly complex. Moreover, the record is silent as to the status of any other pending matters on the trial court's docket. Unfortunately, the trial court did not provide any reasons in the record to support the extent of the delay in ruling on King's motion to dismiss/suppress. Accordingly, we have no choice but to find that 178 days was not a reasonable amount of time for the trial court to rule on King's motion to dismiss/suppress.

**{¶37}** However, it is clear that the trial court was entitled to *some reasonable* amount of time to rule on King's motion to dismiss/suppress. For example, it would appear to us that 72 days, which constitutes the overage in this case, is not an unreasonable amount of time for the trial court to consider the facts and legal issues presented under these circumstances and make its ruling. By way of comparison, we note that the Ohio Rules of Superintendence 40(A)(3) establishes a guideline for trial courts to rule on all motions within 120 days of the filing date. The 72 days here is well within those guidelines.

**{¶38}** In addition, the record demonstrates that it took King 216 days to file a response to the prosecution's request for reciprocal discovery. According to the decision of the Supreme Court of Ohio in *State v. Palmer*, a defendant's failure to respond within a reasonable time to a prosecution's request for reciprocal discovery constitutes neglect that tolls the running of speedy-trial time pursuant to R.C. 2945.72(D). 112 Ohio St.3d 457, 2007-Ohio-374, ¶ 24. There is nothing in

the record to justify such an extensive delay in King's response to the prosecution's request for reciprocal discovery. In fact, on February 3, 2011, when King filed her response, she stated in one very brief paragraph that she anticipated presenting no witnesses or exhibits at trial.

{¶39} Nevertheless, it would seem that not all of this time should be charged against King because much of this period coincided with the period of delay waiting for the trial court to rule on King's motion to dismiss/suppress. However, even assuming *arguendo* that the entire period of 216 days should not be charged against King because it overlapped the 178 days the trial court took to rule on her motion to dismiss/suppress, at least 37 of the 216 days are solely chargeable to King for the delay caused by her neglect in failing to file a response to the prosecution's request for reciprocal discovery within a reasonable time.

{¶40} Finally, we also note that there are other tolling events present in the record which are not disputed by King. Eighteen days were tolled by King filing additional motions, other than the motion to dismiss/suppress, pursuant to R.C. 2945.72(E), and 27 days were legitimately tolled pursuant to R.C. 2945.72(H) by the trial court granting the prosecution's motion to continue the suppression hearing, upon finding such motion "reasonable and necessary." (JE, Aug. 4, 2010).

{¶41} For all these reasons, we find the record demonstrates that taken together, various tolling events occurred that legitimately consumed significantly more than the 72 day overage in bringing King to trial within the 270 day timeframe. Therefore, we conclude that the trial court did not err in overruling King's motion to dismiss because King's right to a speedy trial was not violated. King's second assignment of error is overruled.

*First Assignment of Error*

{¶42} In her first assignment of error, King claims that the trial court erred in overruling her motion to dismiss. Specifically, King argues that her 1995 OVI conviction was constitutionally infirm because it was obtained through an uncounseled plea without a valid waiver of her right to counsel. Thus, King maintains that her 1995 OVI conviction cannot now be used by the prosecution to enhance the degree of her offense from a misdemeanor to a felony.

{¶43} Count One of the indictment in this case specified that King,

**did operate a motor vehicle while under the influence of alcohol, a drug of abuse, or a combination of them, and within 20 years of this offense, said offender had previously been convicted of, or pleaded guilty to, five or more violations of [R.C.] 4511.19(A) or (B), Operating a Vehicle While Under the Influence of Alcohol and/or Drug of Abuse, or other equivalent offenses, to wit:**

**Upper Sandusky Municipal Court Case No. 1995-TRC-5434, 09/18/1995; and**

**Franklin County Municipal Court Case No. 6906-TFC-144783, 01/08/1997; and**

-19-

**Upper Sandusky Municipal Court Case No. 2001-TRC-7133A, 01/07/2002; and**

**Upper Sandusky Municipal Court Case No. 2003-TRC-0535A, 04/30/2003; and**

**Findlay Municipal Court Case No. 2008-TRC-04675A, 10/01/08,**

**in violation of [R.C.] 4511.19(A)(1)(a), being a felony of the fourth degree, contrary to the form and the statute in such case made and provided against the peace and dignity of the State of Ohio.**

(Indictment, Jun. 9, 2010).

{¶44} Section 4511.19(G)(1)(d) of the Revised Code states, in pertinent part, that "an offender who, within twenty years of the offense, previously has been convicted of or pleaded guilty to five or more violations of that nature is guilty of a felony of the fourth degree." In order for the prosecution to convict King of the elevated offense of felony OVI, it had to prove as an essential element of the offense that she had been previously convicted of or pleaded guilty to five or more OVI violations within 20 years of her current offense. *See State v. Allen*, 29 Ohio St.3d 53, 54 (1987) (stating that when existence of a prior conviction does not simply enhance the penalty but transforms the crime itself by increasing its degree, the prior conviction is an essential element of the crime and must be proved by the state). Thus, as essential elements of the crime, King's five prior

OVI convictions must be proved beyond a reasonable doubt. *State v. Brooke*, 113 Ohio St.3d 119, 2007-Ohio-1533, ¶ 8.

{¶45} Section 2945.75(B)(1) of the Revised Code states,

**Whenever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction.**

{¶46} At trial, the prosecution complied with the directives of R.C. 2945.75(B)(1) and presented a certified copy of the judgment entry of each of King's five prior OVI convictions listed in the indictment along with sufficient evidence to identify King as the offender in the entries and the one in the current offense. King does not dispute the existence of her prior convictions. However, in her motion to dismiss and on appeal, King asserts that her 1995 OVI conviction was constitutionally infirm because it was obtained through an uncounseled plea without a valid waiver of counsel. Thus, King argues that the prosecution cannot use her 1995 OVI conviction to support her conviction for the current felony OVI offense.

{¶47} The Supreme Court of Ohio in *State v. Thompson*, 121 Ohio St.3d 250, 252, 2009-Ohio-314, ¶ 6, summarized the burden of proof a defendant must satisfy to demonstrate his or her prior conviction used to enhance an offense was constitutionally infirm.

> **With respect to "uncounseled" pleas, we presume that the trial court in the prior convictions proceeded constitutionally until a defendant introduces evidence to the contrary.  Thus, we conclude that for purposes of penalty enhancement in later convictions under R.C. 4511.19, *after the defendant* presents a prima facie showing that the prior convictions were unconstitutional *because the defendant had not been represented by counsel and had not validly waived the right to counsel* and that the prior convictions had resulted in confinement, the burden shifts to the state to prove that the right to counsel was properly waived.**

(Emphasis added).

{¶48} In addition, R.C. 2945.75(B)(3) provides that "[i]f the defendant claims a constitutional defect in any prior conviction, the defendant has the burden of proving the defect by a preponderance of the evidence."

{¶49} King claims that she satisfied her burden by making a prima facie showing to the trial court that her 1995 OVI conviction was unconstitutional.  As discussed in *Thompson,* "it is beyond dispute that a person has a constitutional right to represent him-or herself; therefore it is not possible to establish a constitutional infirmity merely by showing that a person did not have counsel." *Thompson* at 252.  Accordingly, to meet her burden, King would be required to show *both* that she was unrepresented by an attorney *and* that she did not make a valid waiver of her right to counsel.

{¶50} In determining whether counsel was "properly waived" in a prior case, there is a distinction made between "serious offenses" and "petty offenses."

Criminal Rule 2 defines a "petty offense" as "a misdemeanor other than [a] serious offense" and a "serious offense" as "any felony, and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months." Crim.R 2(C), (D). After reviewing the requirements of Crim.R. 11 and 44, the Supreme Court of Ohio summarized the differing requirements for a valid waiver of the right to counsel in serious and petty offense cases as follows: "Waiver of counsel must be made on the record in open court, and in cases involving serious offenses where the penalty includes confinement for more than six months, the waiver must also be in writing and filed with the court." *State v. Brooke*, 113 Ohio St.3d 199, 2007–Ohio–1533, paragraph two of the syllabus.

**{¶51}** The Judgment Entry journalizing the 1995 OVI conviction states that "Defendant appeared in open court on 9/18/95 and was advised of the nature of the charge against him [sic], the right to counsel, and the various plea available to him [sic]. Defendant waived counsel. Defendant thereafter entered a plea of No Contest to the charge. The Court entered a finding of GUITLY to the charge." (JE, Sept. 18, 1995, Pros. Ex. 28). The Judgment Entry of the 1995 OVI conviction also shows that King's conviction for this offense resulted in confinement, with her serving 10 days in jail. (Id.).

**{¶52}** On appeal, King appears to insinuate that her waiver of her right to counsel was invalid because she did not sign a written waiver and further asserts

that there is no proof that her waiver was knowingly, intelligently, or voluntarily made. King overlooks the fact that her 1995 OVI conviction was for a petty offense and did not require a written waiver. Moreover, as previously discussed, it is *King's* burden to establish that her waiver of counsel was invalid. Therefore, *King* had to demonstrate by a preponderance of the evidence that her waiver of counsel was not knowingly, intelligently, or voluntarily made before the burden shifted to the prosecution to rebut the evidence she presented.

{¶53} The record demonstrates that there was no written transcript of the 1995 OVI plea proceedings admitted for the trial court to review in consideration of this issue. Moreover, it is unclear from the record whether a transcript of the 1995 OVI proceedings was even available. The only evidence King offered in support of her contention that her waiver of counsel in her 1995 OVI conviction is invalid was her own testimony at the motion to dismiss/suppress hearing in the current case on September 30, 2010. The following is an excerpt of King's testimony on direct examination at the motion to dismiss/suppress hearing.

> **Q: Do you recall appearing in Upper Sandusky Municipal Court on or about September 18, 1995?**
>
> **A: Yeah.**
>
> **Q: And do you recall why you were there?**
>
> **A: Yes.**
>
> **Q: Why were you there?**

-24-

**A:   Uhm, I believe a second offense OMVI.**

**Q:   And do you recall what happened at the appearance?**

**A:   Uhm, just standard procedure.   You go in, you set [sic] down and you go through the motions, I guess.**

**\* \* \***

**Q:   And when you appeared in court on September 18, 1995, did you have with you an attorney?**

**A:   No, I did not.**

**Q:   And when you, uhm—did you end up serving [10] days in jail?**

**A:   Yes, I did.**

**Q:   And why would you have proceeded without an attorney?**

**Prosecutor:  Objection.  Again, if she recalls.  I think the first question is do you recall whether?**

**Trial Court:  I agree.**

**Prosecutor:  Okay.**

**Q:   Do you recall why you proceeded without an attorney?**

**A:   I—I knew I could take an attorney with me to court.  I honestly didn't think I had the option of—I thought I had to choose that day.  I thought I had to enter a plea that day.  Like I said, I was young and I don't—I don't even know if I was paying attention to what was going on.  I thought I had to enter a plea that day.**

**Q: Okay. And when you entered your plea of no contest, do you recall, uhm, the Judge having any conversation about your willingness to do that without an attorney?**

**Prosecutor: Objection, leading.**

**Trial Court: Sustained.**

**Q: Do you recall any conversation the Judge had with you after you indicated you wanted to enter—you wanted to enter a plea of no contest?**

**A: Yeah. I remember him explaining what no contest meant.**

**Q: And then you still entered your plea of no contest?**

**A: Hm-hmm.**

**Q: And then was there any conversation between you and the Judge?**

**A: My sentence.**

(Trans. pp. 60-66).

The following testimony was elicited from King on cross-examination.

**Q: You—you told us that you got a six month operator's license suspension.**

**A: Yes.**

**Q: Would it refresh your recollection if I suggested to you that the judgment entry shows that you operator's license was suspended from September of '95 to September of '96.**

**A: That could be.**

**Q: Okay? Could be?**

A:  Hm-hmm.

Q:  So you remembered that inaccurately?

A:  I could have, yes.

Q:  How much of a fine did you pay?

A:  I'm gonna say, eight hundred?

Q:  Would the judgment entry of five fifty be more accurate?

A:  That could be.

Q:  Okay.  What—what were your court costs?

A:  I don't know

Q:  You told us there was maybe 20 people in the room, you're not sure?

A:  Uh-huh.

Q:  You have to answer yes or no.

A:  No.

Q:  You can't say huh-uh or uh-huh.

A:  No, I am not sure.

Q:  And you don't know to use your words, you don't know verbatim what was said?

A:  Right.

Q:  And to use your own words, you weren't paying attention?

A:  Right.

> **Q: But when you were present in court, there was a period of time an explanation of what was going to happen, wasn't there?**
>
> **A: Yes.**
>
> **Q: And you did waive counsel?**
>
> **A: I don't know. I don't remember doing that.**

(Tr. Trans. pp. 68-69).

{¶54} In overruling King's motion to dismiss, the trial court found that King failed to meet her burden of establishing that her waiver of counsel for the 1995 OVI conviction was invalid. Specifically, the trial court found that the 1995 Judgment Entry of her conviction indicated that King was properly advised of her right in open court and that she validly waived counsel. The trial court determined that this Judgment Entry coupled with King's own admissions that she was inattentive at the plea hearing and her incorrectly remembering facts connected with the 1995 case, all prevented her from meeting her burden of proof.

{¶55} After reviewing the record, we conclude that the trial court's decision to overrule King's motion to dismiss is supported by the evidence in the record. King never made an adequate showing that her waiver of counsel during the 1995 plea proceeding was invalid. Other appellate districts have reached similar conclusions when faced with an appellant's inability to establish that a plea was uncounseled or that a valid waiver of the right to counsel was not made. *See, e.g., State v. Biazzo*, 8th Dist. No. 93792, 2010-Ohio-4485; *State v. Mariano*, 11th Dist.

No.2008-L-134, 2009-Ohio-5426; *State v. Tanner*, 9th Dist. No. 24614, 2009-Ohio-3867. Therefore, we find that the trial court did not err in determining that King's 1995 OVI conviction could be used by the prosecution to enhance the degree of King's current offense from a misdemeanor to a felony charge. King's first assignment of error is overruled.

*Third Assignment of Error*

{¶56} In her third assignment of error, King argues that the trial court erred when it overruled her motion to suppress the statements she made to Deputy McKinnon at the hospital after the accident. Specifically, King maintains that she was subject to a custodial interrogation at the time she made the statements and that she should have been given her *Miranda* warnings. Therefore, King asserts that her statements to Deputy McKinnon were inadmissible at trial.

{¶57} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003–Ohio–5372, ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id*. When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Id*. With respect to the trial court's conclusions of law, however, our standard of

review is de novo, and we must decide whether the facts satisfy the applicable legal standard. *State v. McNamara*, 124 Ohio App.3d 706, 710 (1997).

{¶58} In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), the United States Supreme Court held that the State may not use statements stemming from a defendant's custodial interrogation unless it demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. *Id*. at 444. Police are not required to give *Miranda* warnings to every person that they question, even if the person being questioned is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440 (1997). Instead, *Miranda* warnings are only required for custodial interrogations. *Id*.

{¶59} The Supreme Court in *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave. *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457 (1995). Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective

test to resolve "the ultimate inquiry" of whether there was a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 (1983) quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711 (1977).

{¶60} The following testimony was presented at the suppression hearing regarding the circumstances surrounding Deputy McKinnon's questioning of King at the hospital and the statements King made during this interview. Deputy McKinnon testified that when he first arrived at the scene of the accident he met with Officer Fawcett, who informed him that King had been identified as the only known occupant of the vehicle and that she appeared to be under the influence. Deputy McKinnon also recalled Officer Fawcett informing him that King had given inconsistent statements regarding how many occupants were in the vehicle. Deputy McKinnon testified that he was not able to talk to King at the scene of the accident because she was being administered first-aid and he did not want to interfere with her welfare. Deputy McKinnon testified that he then took this time to survey the accident scene to determine what had happened that night.

{¶61} Deputy McKinnon subsequently arrived at the hospital, where King had been transported to by first responders. There, Deputy McKinnon observed King behaving in an extremely hostile manner towards the hospital staff who were trying to administer medical treatment. Deputy McKinnon waited to speak with

King until the hospital staff had stabilized her, and until the hospital staff cleared out of the area and informed Deputy McKinnon that he could speak with King. Deputy McKinnon then approached King to speak with her. Deputy McKinnon recalled that King was unable to move because she was placed on a backboard and her head was secured in a "c-collar." Deputy McKinnon recalled that King could not physically leave the room without the help of the hospital staff.

{¶62} Deputy McKinnon testified that he introduced himself, told King that he was investigating the accident, and asked if he could speak with her. Specifically, Deputy McKinnon testified that he informed King that he needed to get answers about what happened, in particular to verify if there were in fact other people inside the vehicle so that he could ensure their safety. Deputy McKinnon recalled that King did not want to speak to him at first, and that King was initially very hostile and belligerent towards him. However, Deputy McKinnon testified that not even a "long minute" had passed before King then began asking him questions, wanting to know what had happened. Deputy McKinnon informed King of his findings regarding the accident. He then asked her if she had been drinking. King admitted to drinking several beers at Sonny Jack's, a bar in New Riegel. Deputy McKinnon testified that he asked King if she was the one driving the vehicle and King responded that she was not driving, but had met a man at the bar with whom she left.

{¶63} Deputy McKinnon asked King about this man and King stated that she couldn't remember his name or what he looked like. At this point, Deputy McKinnon recalled that King again became belligerent and was not cooperating with him. Deputy McKinnon described King as repeating the same story over and over again and leading him in circles when he told her that an eye witness had seen her as the only occupant inside the vehicle.

{¶64} Deputy McKinnon recalled that while he was talking to King he noticed a strong odor of alcoholic beverages emitting from her person. Deputy McKinnon testified that this odor, coupled with King's behavior and her vagueness regarding whether there was actually another person in the vehicle, led Deputy McKinnon to believe that he had probable cause to arrest King for OVI. Deputy McKinnon testified that upon reaching this determination, he read King the BMV 2255 form and placed her under arrest. Deputy McKinnon testified that the only question he asked King after placing her under arrest was to request she submit to a test to measure the level of alcohol in her system. Deputy McKinnon recalled at that time the hospital staff came into the room to draw King's blood and he subsequently left King's hospital room.

{¶65} Deputy McKinnon stated that the hospital staff then asked him if King was free to leave the hospital and he responded that he was not going to take King into custody, meaning that he was not going to transport her to the Sheriff's

Office to be incarcerated. Deputy McKinnon testified that he did not have contact with King until later that day when he visited her at her home.

**{¶66}** On appeal, King argues that her statements were obtained in a custodial interrogation. King appears to focus solely on the fact that she was restrained by a backboard and a "c-collar" and did not feel free to leave. In support of her argument, King cites to a single case *State v. Brand*, 157 Ohio App.3d 451, 2004-Ohio-1490 (1st Dist.). In that case, Brand was hospitalized after a single car accident and was suspected of OVI. *Id.* at ¶¶ 2-4. Brand was placed on a backboard and her neck was secured in a neck brace, leaving her unable to move. *Id.* at ¶ 36. Throughout the interview with law enforcement, Brand expressed an unwillingness to answer questions and complained of pain. *Id.* at 38. The trial court and the first appellate district concluded that Brand was subject to a custodial interrogation because "a reasonable person in Brand's position would have not felt free to leave or free not to answer the police questions." *Id.*

**{¶67}** First, we find there are clear factual distinctions between *Brand* and the case at hand. King never complained of being in pain during the interview with Deputy McKinnon. Moreover, King initiated conversation with the deputy immediately after she expressed that she did not want to speak to him. The only similarity between Brand's and King's cases is the fact that both defendants were

secured by a backboard and "c-collar" and unable to move when they made their statements to law enforcement. We believe this fact standing alone is insufficient to determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave.

{¶68} Second, we are not persuaded with the court's conclusion in *Brand* that simply because she was placed in a backboard and a neck brace and could not move "for practical purposes, Brand's freedom of movement was restrained as if she had already been placed under formal arrest." *Brand* at ¶ 38. Instead, in this instance, we believe that one of the critical circumstances to be considered in determining whether King was subject to a custodial interrogation at the hospital is to examine the reasons for her restraint. King was never restrained by the actions of the State. Rather, her restraints were placed upon her by hospital staff for medical treatment purposes. Thus, King was "restrained" or unable to move solely due to her medical situation. Moreover, we believe the fact that King voluntarily initiated conversation with law enforcement further removes her situation from a custodial interrogation. *See State v. Feaster*, 9th Dist. No. 24367, 2009-Ohio-2558, ¶ 10 (finding that the defendant was not subject to a custodial interrogation where he was not able to go anywhere due to his own medical situation and where he voluntarily engaged in the interview).

{¶69} In addition, it is clear that Deputy McKinnon's initial purpose in talking to King at the hospital was to investigate the circumstances of the accident. This was the first opportunity Deputy McKinnon had to ask King about the accident. Deputy McKinnon testified that he was concerned with trying to ascertain whether there were in fact other occupants in the vehicle because he needed to ensure they were safe and expressly stated the intent of his questioning to King. Moreover, the record demonstrates that at the moment Deputy McKinnon developed probable cause to believe that King had committed the offense of OVI, he placed her under arrest.

{¶70} Finally, we note even assuming *arguendo* that King's statements at the hospital should have been suppressed, the admission of the statements was harmless error because King made similar incriminating statements to Deputy McKinnon during an interview at her home later that day. Notably, on appeal King has raised no challenge with regard to the statements made at her home. Thus, despite King's contentions regarding the statements at the hospital, we find that her statements at her home were consistent with her prior statements at the hospital and did not serve to undermine her credibility to the jury. Moreover, even if we were to find that King's statements at the hospital and at her home were inadmissible, there was a substantial amount of circumstantial evidence presented at trial through the testimony of various witnesses for a reasonable factfinder to

conclude that King was driving her vehicle while under the influence of alcohol on the night in question.

**{¶71}** For all these reasons, we conclude that the trial court did not err in determining that King was not subject to a custodial interrogation when she made statements to Deputy McKinnon at the hospital. Therefore, the fact that she was not Mirandized prior to making those statements was not a violation of her Fifth Amendment rights. King's third assignment of error is overruled.

### *Fourth Assignment of Error*

**{¶72}** In her fourth assignment of error, King argues that she received ineffective assistance from her trial counsel. In particular, King asserts that the decision of her trial counsel to allow an unredacted version of King's BMV record to be submitted the jury was highly prejudicial because it contained a suspension of King's operator's license due to a prior felony drug conviction. King maintains that evidence of this prior felony conviction would otherwise have been inadmissible for the jury to view if was not for her trial counsel's decision.

**{¶73}** Initially, we note that attorneys licensed by the State of Ohio are presumed to provide competent representation. *State v. Hoffman*, 129 Ohio App.3d 407 (1998). To prevail on a claim of ineffective assistance of counsel, a defendant must prove that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a

result.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, paragraph two of the syllabus (1989).  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  *Strickland,* 466 U.S. at 687.

{¶74} Also, in order to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial or in his legal proceedings would have been different.  *Bradley*, 42 Ohio St.3d at paragraph three of the syllabus.  "Reasonable probability" is a probability sufficient to undermine confidence in the result.  *Id*. at 142.

{¶75} When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  Accordingly, courts are to afford a high level of deference to the performance of trial counsel.  *Bradley*, 42 Ohio St.3d at 142.  Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance.  *State v. Carter*, 72 Ohio St.3d 545, 558, 1995-Ohio-104.  Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client.  *See Bradley* at 141-142.

{¶76} Prior to trial, the parties discussed the prosecution's intention to submit a redacted version of King's BMV record to the jury which only displayed information relating to King's five prior OVI convictions specified in the indictment. On the record, King's trial counsel objected to the submission of the redacted version of the BMV record because it contained "large gaps of white space" which she felt was inappropriate. (Trans. Tr. p. 13). It is evident from the record that one of King's defense strategies was to be forthcoming and to demonstrate accountability for her past offenses. The decision of her trial counsel to prevent a version of King's BMV record with "large gaps of white space" to be presented to the jury, which might encourage unfavorable speculation as to a significant amount of past criminal activity, appears to be in line with this tactic. Accordingly, we cannot say that this trial decision alone demonstrates that King's trial counsel's performance fell below objective standards of reasonable representation.

{¶77} Moreover, King failed to meet her burden in showing that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. As an essential element of the offense charged in this case, the prosecution already had to prove beyond a reasonable doubt that King had previously been convicted of five or more OVI offenses within the past twenty years. The prosecution accomplished this by introducing certified copies of the

judgment entries demonstrating King's prior convictions, and thus the jury was already fully aware of at least five prior alcohol related convictions. Accordingly, we fail to see how the outcome would have been different had King's unredacted BMV record showing a single additional possible substance abuse offense not been submitted to the jury. King's fourth assignment of error is overruled.

### *Fifth Assignment of Error*

{¶78} In her fifth assignment of error, King claims the jury verdict is against the manifest weight of the evidence and argues her conviction must be reversed.

{¶79} An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id*. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1–05–

70, 2006–Ohio–3764, ¶ 30, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *Thompkins*, 78 Ohio St.3d at 387.

{¶80} King was convicted of the offense of OVI, in violation of R.C. 4511.19(A) which provides, in pertinent part,

> **(1)  No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply:**
>
> **(a)  The person is under the influence of alcohol, a drug of abuse, or a combination of them * * *.**

On appeal, King contends that the jury lost its way in convicting her of OVI because the prosecution failed to present adequate evidence demonstrating that King operated the vehicle or was under the influence of alcohol on the night in question.

{¶81} With regard to her first claim, King argues the jury verdict was against manifest weight of the evidence because no one testified to seeing King operating the vehicle.  King overlooks the fact that there was ample circumstantial evidence introduced at trial for the jury to conclude she was the one operating the vehicle.  At trial, a recording of King's interview with Deputy McKinnon at her home was played for the jury.  In this interview, King could not remember if she was the one driving or not.  Moreover, King could not definitively remember whether there was another person in the vehicle with her who could have been

driving. She admitted to Deputy McKinnon that she blacks out almost every time she drinks.

{¶82} In addition, Kelly Wickham, the witness who discovered the accident and alerted the authorities, testified that King was the only person he saw at the scene. Officer Fawcett testified that upon arriving at the site of the crash, he had the spotlight illuminated on his police cruiser as he searched the accident scene. Officer Fawcett further testified that he believed he would have easily seen another person as he approached the accident site because it was a low populated area surrounded by fields and he was using his spotlight to scan the ditches. Officer Fawcett also recalled that when he first encountered King he asked her whether she was injured and if she was the only occupant in the vehicle. Officer Fawcett testified that King responded stating she was not injured and that she *was* the only occupant.

{¶83} Officer Fawcett also recalled searching for a second person at the accident site once King began to give inconsistent statements regarding the number of occupants in the vehicle. Officer Fawcett described assisting members of the Carey Fire Department in a search for more occupants to make sure no one else was injured. He explained that they walked up and down road 100 to 150 yards in either direction scanning the fields for footprints or mud paths in the grass berm. Chad Snyder a volunteer firefighter and Chief of his unit testified that he

conducted a search of the fields with infrared cameras, looking for other possible occupants of the vehicle. He recalled that at the time, the wheat in the fields was between knee-high and hip-high. Chief Snyder recalled looking in the field for trampled wheat to see if anyone had made their way into the fields and then collapsed. Both Officer Fawcett and Chief Snyder testified that they did not find anyone else besides King at the scene. Based all on this evidence, we believe a reasonable factfinder could have concluded that King was in fact the person who operated the vehicle on the night in question.

{¶84} King also challenges the jury verdict is against the manifest weight in arguing that there was inadequate evidence presented at trial demonstrating she was under the influence of alcohol that night. Officer Fawcett testified that he determined King to be under the influence of alcohol based on his observations and interactions with her. Specifically, he recalled that King's eyes were bloodshot and glassy, her speech was slurred, and she was wobbly on her feet. Officer Fawcett testified he noticed a crushed beer can near the passenger's door of the vehicle. A picture of the aluminum Busch Light beer can was admitted as an exhibit at trial. During her interview with Deputy McKinnon, King stated that Natural Light and Busch Light were her usual beverages of choice. She also told Deputy McKinnon that it was quite possible she was drinking Busch Light that night.

{¶85} In this interview, King also admitted to drinking beer at four different places on the night in question. Deputy McKinnon asked King several questions about the events preceding the accident which King could not answer because she did not remember. When Deputy McKinnon asked King whether she met someone at the bar, she again responded that she did not know, specifically by commenting that "it's hard telling when you're intoxicated." In addition, Deputy McKinnon testified, that at the hospital, he smelled a strong odor of alcoholic beverages emitting from King's person. Deputy McKinnon noticed the change in King's demeanor at her home from when she was at the hospital. King admitted in the interview at home that she is a completely different person when she drinks and apologized for her belligerent behavior toward the deputy at the hospital.

{¶86} After reviewing the record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we conclude that a reasonable factfinder could have found that King was the person operating her vehicle under the influence of alcohol on May 19, 2010. Therefore, we further conclude that the jury did not lose its way and create a manifest miscarriage of justice in reaching this conclusion. Accordingly, we find that King's conviction was not against the manifest weight of the evidence. King's fifth assignment of error is overruled.

**{¶87}** For all these reasons, the judgment is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**